IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| VALISHA C. PRICE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 05-3345-CV-W-ODS ) |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for supplemental security income benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in June 1978 and alleges she became disabled effective October 15, 2002. However, she did not file her application until August 15, 2003, so she must establish that she was unable to work on or after that date in order to receive benefits. She has a high school education and prior work experience as a bartender. She also briefly worked as a pizza maker, cashier, and with her mother cleaning buildings.

In October 2002, on the instruction of Dr. Tracy Kennetz at Cox Medical Center ("CMC"), an MRI was performed. It revealed herniation of the discs at L3-4, L4-5, and L5-S1 with an effect on the nerve roots, but no spinal stenosis. These findings were deemed to potentially explain Plaintiff's complaints. R. at 240-42. Dr. Kennetz prescribed Vicodin and Naprosyn and told her to rest in bed for one week. R. at 244-46. Plaintiff returned to CMC on November 21 and saw Dr. Robert Strang. He described Plaintiff as a "morbidly obese black female in no acute distress. . . . Motor examination

reveals some mild giveaway weakness in the distal right lower extremity. However with distraction she has full strength. In addition, on heel-toe ambulation, she does have difficulty secondary to pain. However she does have full strength." R. at 230. Dr. Strang opined "any treatment in the form of steroid injections, physical therapy or surgical therapy is not likely to be successful unless she loses a significant amount of weight. We offered to set her up with a referral to a weight-loss program, however, she stated that she would like to have this done through Dr. Allen, her primary care doctor." R. at 231. The Record does not reflect Plaintiff ever started a weight loss program; her weight at this time was 275 pounds, R. at 237, and at the time of the hearing she weighed 267 pounds. R. at 43. Dr. Strang admitted Plaintiff and ordered a new MRI, which revealed compression on the nerve root at L5, but the bulges at L2-3 and L3-4 were deemed to be "unlikely" to cause any pressure on the nerves. R. at 235. While hospitalized, Plaintiff was administered medication and, "[a]fter several days, her pain did subside and she was able to tolerate pain well on oral pain medication." R. at 227. She was referred for a rehabilitation consult, at which time she stated her pain was "5/10 on a 0-10 pain scale" and it was "very well controlled." Recommendations included diet and exercise modifications for the purpose of losing weight, an outpatient physical therapy program, use of moist warm packs, and medication. R. at 223-25.

  Plaintiff underwent gall bladder surgery in January 2003. In early February 2003, Plaintiff returned to see Dr. Kennetz about her back and reported that she was doing "much better" while undergoing physical therapy but she had to stop while recovering from her surgery. She was still overweight (weighing 250 pounds) and still smoking; Dr. Kennetz administered injections of Demerol and Phergan, told her to continue taking the medication she had been prescribed, stop smoking and lose weight. R. at 202-04. Later that month, another doctor at CMC (Dr. Boyd Crockett) referred Plaintiff to CMC's pain clinic. There, Dr. Mark Bult administered an epidural steroid injection. R. at 197-200. On March 11, Plaintiff told Dr. Bult the injection resulted in "good relief, approximately 75%." R. at 196. Dr. Bult administered another injection on March 27, R. at 183-85, and another one approximately one month after that. R. at 180-82. On August 11, Plaintiff told Dr. Strang she was experiencing pain in her back but not her

legs.  He concluded Plaintiff would not be benefitted by surgery (or, most likely, any other treatment) until she lost weight.  Absent a loss of weight, he encouraged her to resume physical therapy.  R. at 380.

Plaintiff returned to CMC's pain clinic in October 2003 and saw Dr. James Daily.  She reported the previous injections had provided "100% relief of her pain for over ten months and then the pain has gradually returned.  She now has pain in the neighborhood of a 4 on a scale of 1-10."  Another epidural injection was administered.  R. at 137-40.

Meanwhile, Plaintiff was also seeing Dr. Larry Allen, her regular physician.  In November 2002, at Plaintiff's request, he provided a note indicating Plaintiff should remain off work until her back was evaluated further.  R. at 365.  Dr. Allen generally provided refills of the medication Plaintiff had been prescribed.  However, on December 30, Dr. Allen declined to refill her prescription for Vicodin.  He explained that Dr. Strang "started her on Bextra and specifically stated she shouldn't take Vicodin.  It is possible they are concerned about drug seeking so she needs to keep this with her specialist alone."  R. at 357.  On January 3, 2003, Plaintiff called Dr. Allen and advised "Dr. Crocketts [sic] office . . . told her that if she wanted to have the Vicodin again, she needed to contact" Dr. Allen.  Dr. Allen declined to provide Vicodin in light of Dr. Strang's actions.  R. at 357.  In late January, Plaintiff indicated she was on medical leave from work due to her gallbladder surgery, and once cleared she would also be able to resume physical therapy (which had provided help for her back pain).  R. at 354.  On February 4, Plaintiff again asked for narcotic pain medication, and was again told she would have to consult with Dr. Strang because he "must feel she has drug seeking tendencies as well since one of their notes suggests going with Bextra only and no hydrocodone."  R. at 352.  On February 11, Plaintiff was advised to resume physical therapy.  R. at 347.  On February 28, Plaintiff reported she had resumed physical therapy and had been given narcotic pain medication from a "Dr. Baker" at CMC's pain clinic.  R. at 345.  However, on March 18, Dr. Allen wrote that he was "not treating her back pain anymore.  She has played us against the specialists before, usually to try to get Hydrocodone."  R. at 340.  Nonetheless, on July 21, Plaintiff again requested

3

Vicodin, explaining she had obtained Percocet during a recent ER visit but the medicine was "too strong for her" and made her sick. Dr. Allen refused to prescribe Vicodin. R. at 318.

During the hearing (which was held on February 10, 2005), Plaintiff testified she lived with her boyfriend and his father. Her previous jobs required her to stand all or most of the day and did not require any lifting. R. at 41-42. She reported that she required surgery for the bottom disc but the surgeon "doesn't want to go in and fix the bottom one, and then have to go back in in a year and fix the other ones, so he suggested that I wait." R. at 44-45. She experiences "[l]ots of pain" on a constant basis that precludes her from standing straight and sitting for more than thirty to forty-five minutes without needing to change positions. R. at 45-47. Plaintiff estimated that she can spend a total of three hours a day sitting and standing; the rest of the time she has to lie down. R. at 47. She can walk approximately half a block and stand for no more than five to ten minutes. R. at 47-48. Plaintiff testified she was prescribed a walker and uses it to help her walk, but did not bring it the day of the hearing because she does not like to use it. R. at 48. She also testified her doctor prohibited her from lifting or carrying anything. R. at 47.

Plaintiff described the pain as extending from her lower back into her legs and described its severity as "never under five" and at its worst a ten on a scale of one to ten. R. at 49. She spends seven hours during the day in bed with her feet elevated. R. at 50. Her medication makes her drowsy and she is constantly fatigued. R. at 53. She had a driver's license but does not drive because sitting is difficult; her boyfriend's father drives her to the places she needs to go. She reported no activities, no household duties (other than going to the grocery store), and no hobbies other than cross-stitching or putting puzzles together. R. at 54-55.

The ALJ also elicited testimony from a vocational expert ("VE"). When asked to assume an individual of Plaintiff's age, education and experience who could only stand for five to ten minutes, sit for thirty minutes at a time and a total of three hours, walk half a block, refrain from lifting anything, and must lie down all but one hour of the day, the VE testified such an individual could not perform any work. R. at 57. The VE was then

4

asked to consider the limitations contained in a form prepared by a state agency doctor (Dr. Judy Robbins). Dr. Robbins reviewed Plaintiff's records but did not examine her; based on those records, Dr. Robbins completed a Physical Residual Functional Capacity Assessment indicating Plaintiff could occasionally lift fifteen pounds and frequently lift less than ten pounds, stand or walk at least two hours in a workday, and sit a total of six hours a day. R. at 381-88. The VE testified such an individual would be limited to unskilled sedentary work such as assembler or table worker. R. at 57-58. The ALJ modified the second hypothetical to limit the individual to sitting for thirty minutes at a time and stand for thirty minutes at a time; the VE testified such a person could be accommodated in the workplace. R. at 58. However, if the ability to stand was further reduced to ten minutes at a time, the individual could not sustain work. R. at 58-59.

The ALJ conceded Plaintiff experiences pain that limits her ability to function; however, he concluded her testimony about the extent of that pain and those limitations was not credible, primarily because her testimony was inconsistent with her doctors' reports and her own prior statements (both to doctors and elsewhere in the record). He also considered Plaintiff's inconsistent earning record and apparent lack of motivation to work. Ultimately, the ALJ concluded Plaintiff was limited in the manner described in Dr. Robbins' report with the added limitation of being able to sit for only thirty minutes at a time and stand for only thirty minutes at a time. Based on the VE's testimony, the ALJ concluded Plaintiff was able to perform work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this

5

Case 6:05-cv-03345-ODS   Document 10   Filed 05/05/06   Page 5 of 8

standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Listed Impairments

Plaintiff first argues the ALJ erred in failing to conclude she suffers from a listed impairment. A claimant whose condition meets or equals a listed impairment is presumed disabled at the third step of the five-step sequential process, and there is no need to consider the final two steps (as the ALJ did in this case). Plaintiff seems to suggest she is disabled by virtue of Listing 1.00Q, which is part of the listing for musculoskeletal impairments and advises the ALJ to consider the effect of obesity when determining whether the claimant meets or equals one of the listed impairments. However, 1.00Q is not, in and of itself, a listed impairment; instead, it directs that an additional factor be considered in evaluating the effect of other impairments alleged to meet or equal a listing. Plaintiff does not identify any of the listed musculoskeletal impairments she allegedly meets or equals, so she is not entitled to benefits at step three of the analysis.

### B. The ALJ's Factual Findings

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

6

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or
> mental impairment, direct medical evidence of the cause and
> effect relationship between the impairment and the degree of
> claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective
> complaints solely because the objective medical evidence
> does not fully support them.
>
> The absence of an objective medical basis which supports
> the degree of severity of subjective complaints alleged is just
> one factor to be considered in evaluating the credibility of the
> testimony and complaints. The adjudicator must give full
> consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work
> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
> > 1. The claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of medication;
> > 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Plaintiff did not report the limitations she described in her testimony to her doctors. The Court accepts Plaintiff's argument that her subjective complaints of pain cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. However, the inconsistency between her statements (1) when she was motivated by a desire to obtain benefits and (2) when she was motivated by a desire to obtain treatment provides a basis for the ALJ's decision. In addition, Plaintiff's testimony was inconsistent with the medical records in several respects. For instance, she has not identified (and the Court could not locate) any indication she was prescribed a walker. In fact, Plaintiff disavowed any use of assistive devices at an

7

earlier stage of these proceedings. R. at 124. There is no indication any doctor indicated surgery should wait because this would reduce the need for additional surgeries; the Record demonstrates Plaintiff was told surgery would not do any good until she lost weight. Plaintiff intimated that she has lost weight because she once weighed in excess of 400 pounds; this may be, but at the time she was told to lose weight in order for surgery to be effective she weighed 275 pounds and since then she has lost less than ten pounds.

There are other factors in the record as well. Plaintiff's doctors have not suggested she is limited to the degree described in her testimony. Plaintiff reported that physical therapy helped alleviate her pain, but there is no indication she resumed physical therapy after being cleared to do so following gall bladder surgery. Plaintiff has also obtained relief from medications (including epidurals). Finally, the ALJ was entitled to consider Plaintiff's poor work history and the fact she is able to support herself by relying on her boyfriend and his father as indicating Plaintiff is not motivated to work.

Factual matters, including the claimant's credibility, are matters for the ALJ to decide. Substantial evidence in the record as whole supports the ALJ's decision to reject Plaintiff's testimony and to determine her functional capacity is not as limited as she described. Nothing else in the record suggests the ALJ's findings about Plaintiff's residual functional capacity are understated.

### III. CONCLUSION

For these reasons, the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

DATE: May 5, 2006

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT